UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LSH CO, LSH II CO, and WELLS FARGO BANK,  :
NATIONAL ASSOCIATION, as securities       :
intermediary for LSH CO and LSH II CO,    :
                                          :
                    Plaintiffs,           :    **CIVIL ACTION NO.  18-cv-2111**
                                          :
        v.                                :    **COMPLAINT**
                                          :
AXA EQUITABLE LIFE INSURANCE COMPANY,     :    **JURY TRIAL DEMANDED**
                                          :
                    Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiffs LSH CO and LSH II CO (collectively "<u>LSH</u>"), and Wells Fargo Bank, National

Association ("<u>Wells Fargo</u>"), solely in its capacity as securities intermediary for LSH, by and

through their attorneys, file this Complaint against Defendant AXA Equitable Life Insurance

Company ("<u>AXA</u>"), and allege as follows:

<u>NATURE OF THE ACTION</u>

      1.     This is an action based on AXA's unlawful and excessive cost of insurance

("<u>COI</u>") increase on a discriminated group of Athena Universal Life II life insurance policies

("<u>AUL II Policies</u>").  Plaintiffs own 50 AUL II Policies issued between 2005 and 2007 (the

"<u>LSH Policies</u>").  The LSH Policies, as well as other AUL II Policies owned by other individuals

or entities, were targeted for this increase because they (a) were issued on insureds who were 70

years of age or older (*i.e.*, the "issue age" was 70 or older); and (b) have a face amount of

$1 million or more.

      2.     By drastically raising the COI rates on the AUL II Policies, including the LSH

Policies, AXA has forced LSH to either (1) pay exorbitant premiums that AXA knows would

substantially reduce the value of the policies, or (2) lapse or surrender their policies, thereby

forfeiting the premiums they have paid for a number of years.  AXA, on the other hand, stands to

gain a huge windfall through either unallowable higher premium payments, both past and future, or by holding onto premiums it already has received for policies on which it never needs to pay death benefits. Indeed, AXA stated in its 2015 Form 10-K filed with the Securities and Exchange Commission that it expected the COI Rate (defined below) increase on AUL II Policies to result in a $46 million increase to net earnings in 2015 alone. AXA subsequently reported that it had realized the $46 million increase in just the first nine months of 2015. AXA's most recent securities filings contain similar statements.

3.      The cost and harm to LSH, and other policyholders, is substantial. For instance, for the LSH Policies alone, the improper COI Rate increases will result in a total *increase* of nearly $200 million in premiums through the maturity of the LSH Policies.

4.      AXA's misconduct, as described more fully herein, constitutes express breaches of Plaintiffs' policies, but also constitutes breaches of the implied covenant of good faith and fair dealing. Moreover, AXA's purported justifications for the COI Rate increase establish that AXA knowingly has made numerous material misrepresentations in violation of New York Insurance Law Section 4226. Therefore, Plaintiffs seek compensatory and punitive damages, as well as equitable relief and attorneys' fees.

<u>THE PARTIES</u>

5.      Plaintiff LSH CO is a public limited liability company (société anonyme) incorporated and existing under the laws of the Grand-Duchy of Luxembourg, having its registered office at 14, rue Edward Steichen, L- 2540 Luxembourg.

6.      Plaintiff LSH II CO is a public limited liability company (société anonyme) incorporated and existing under the laws of the Grand-Duchy of Luxembourg, having its registered office at 14, rue Edward Steichen, L-2540 Luxembourg.

7.    Plaintiff Wells Fargo is a national banking association with its principal place of business in Sioux Falls, South Dakota.  LSH are the ultimate beneficiaries of the AUL II Policies at issue in this case, which they hold in a securities account maintained by Wells Fargo, solely as securities intermediary for LSH pursuant to a Securities Account Control Agreement.  As the securities intermediary, Wells Fargo is "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8-102(a)(14)(ii).  Each life insurance policy at issue constitutes a "Financial Asset" that Wells Fargo, as securities intermediary, has credited to the securities account.  LSH are the "entitlement holders" and are entitled to exercise the rights with respect to each Financial Asset credited to the securities account.  LSH own the ultimate financial interests in the policies.  Wells Fargo, as securities intermediary for LSH, is identified as the owner and beneficiary on the records of the insurance company, AXA.

8.    Upon information and belief, AXA is a New York corporation with its principal place of business at 1290 Avenue of the Americas, New York, NY 10104.  Upon information and belief, AXA regularly conducts its business within this judicial district.

<u>JURISDICTION AND VENUE</u>

9.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000; and there is complete diversity of citizenship, as Plaintiffs are citizens of Luxembourg and South Dakota; and Defendant is a citizen of the State of New York.

10.    This Court has personal jurisdiction over AXA because, upon information and belief, AXA has its principal place of business in New York, New York and regularly conducts and transacts business in this state.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because, upon information and belief, AXA resides in the Southern District of New York.

<u>FACTUAL ALLEGATIONS</u>

A.     Plaintiffs are Owners of Universal Life Insurance Policies
       <u>Subject to AXA's COI Rate Increase</u>

12.     The LSH Policies range in face amount from $1.8 million to $25 million and are listed in the attached ***Exhibit 1***.  The LSH Policies were issued and delivered by AXA in the States of Alabama, California, Colorado, Florida, Georgia, Illinois, Indiana, Minnesota, Mississippi, New York, Pennsylvania, Rhode Island, Texas, and Wisconsin.  A sample LSH Policy, redacted for privacy, is attached hereto as ***Exhibit 2*** ("<u>LSH Doe Policy</u>").  As noted above, Wells Fargo is listed on AXA's records as the owner and beneficiary of the LSH Policies, but solely as securities intermediary for LSH.  LSH provide the funding to maintain the policies at issue in force and, as the entitlement holders, own the ultimate financial interest in the LSH Policies.

13.     The LSH Policies are universal life insurance policies.  Universal life insurance is a product that was designed to provide more flexibility and choices to policyholders with respect to features of their insurance than what was available with traditional whole life insurance.  In contrast to traditional whole life insurance which generally involves fixed premium payments over the life of the policy with a fixed death benefit, universal life insurance offers policyholders the option to increase or decrease their premiums at their discretion based on their individual circumstances and choices.

14.     AXA explicitly promoted these flexible premium policies as policies that would allow policyholders to design premium payments according to their budget and to choose the amount and frequency of their premium payments.  The LSH Policies all are contracts of

adhesion in that they are form policies, and insureds are not permitted to negotiate different terms.

15.    Universal life insurance consists of two separate components.  The first is the life insurance or "mortality" component, which an insurance company charges to cover the risk of the insured's death (*i.e.*, the cost of insurance or "COI").  The second is the accumulated value or "savings" component, which functions as an investment vehicle and is where excess premiums accumulate and earn interest.  The excess premium is the amount of the premium above the insurer's COI.  Universal life insurance "unbundles" these two components to allow policyholders to choose whether to pay just enough premiums to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest.

16.    When an owner of a universal life insurance policy makes a premium payment, that payment is credited towards a "Policy Account."  The insurer periodically deducts certain expenses that are set forth in the insurance contract—specifically the monthly COI and certain administrative fees—from the Policy Account.  However, any excess funds that remain in the account will bear interest at a minimum rate provided by the contract.  The funds in that account can then be used to pay future insurance expenses, thus reducing the amount of subsequent premium payments, or they can be left to accrue interest.

17.    As long as the Policy Account balance is sufficient to cover expenses, the policy remains in place pursuant to the terms of the original contract.  If the policyholder stops paying premiums and the funds in the Policy Account become insufficient to cover the amounts owed for expenses, the policy will enter a grace period and eventually lapse.

18.     The monthly COI is calculated by a contractual formula where the monthly cost of insurance rate ("COI Rate") is multiplied by the net amount of risk at the beginning of the policy month.  The COI Rate is designed to cover the cost of the life insurance policy and is the largest and most significant charge under AUL II Policies such as the LSH Policies.

19.     The COI Rate is an example of a "non-guaranteed" component, meaning the insurer retains the right to adjust that element subject to the terms of the contract.  "Guaranteed" elements, such as the guaranteed minimum interest rate on the savings component, described below, are fixed and cannot be changed by the insurer.  Guaranteed elements are subject to review and approval by regulatory authorities, the parameters of which are made available to the general public.  Non-guaranteed components usually are not reviewed by, and not limited or approved by, regulatory authorities.

20.     All 50 LSH Policies state that AXA "will determine [COI] rates from time to time."  However, this determination is carefully circumscribed in a provision entitled "Changes in Policy Cost Factors."  This provision provides:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses.  Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy.  Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

21.     The 50 LSH Policies also contain a provision that assures a minimum rate of interest on the Policy Account value, otherwise known as the "guaranteed minimum crediting rate."  The guaranteed minimum crediting rate is 3%.  Moreover, the LSH Policies promise that

even if other cost of policy factors change, including the COI Rates, this will "never result in an interest crediting rate that is lower than" the guaranteed minimum crediting rate.

22.     Accordingly, there are a number of express contractual limitations on AXA's ability to institute COI Rate changes, including:  (1) all changes must be based on "reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses;" (2) all changes must be "equitable to all policyholders of a given class;" (3) any changes cannot result in a crediting rate that is less than the guaranteed minimum crediting rate; and (4) any changes will be determined in accordance with procedures and standards on file with the applicable state insurance regulators.

B.     AXA Unlawfully Increased COI Rates

23.     In October 2015, AXA notified Plaintiffs by letter that it was increasing COI Rates on the LSH Policies, but only those with issue ages of 70 or older and with current face amounts of $1 million and higher.  *See* example of such letter for the LSH Doe Policy attached hereto as *Exhibit 3*.  Specifically, the letter states that AXA was "adjusting your universal life insurance policy in a way that will increase the monthly cost-of-insurance (COI) deductions from your policy and which is likely to require payment of additional premium to help ensure that your policy will perform as previously illustrated." *Id.*  AXA's letter advised that the COI Rate increase would go into effect in January 2016. *Id.*  A subsequent notification from AXA advised that the increase would go into effect with the first monthly deduction processed on or after March 8, 2016.  *See* example of such letter for the LSH Doe Policy attached hereto as *Exhibit 4*.

24.     All of the LSH Policies were subject to significant COI Rate increases.  AXA never has shared with policyholders how much their increase would be.  However, recent calculations estimate that, on average, AXA has increased the COI Rate on the LSH Policies by at least 40%.

25.     AXA's purported justification for this increase was based on two factors, mortality and investment income for the AUL II Policies, which were supposedly less favorable than expected.  The Wall Street Journal quoted from an AXA spokesperson who explained that the increase was implemented because "the company had concluded one of its older life-insurance products wasn't performing as expected because policyholders were dying sooner and investments were earning less than forecast when the policies were sold."  AXA's SEC Form 10-Q, for the period ended September 30, 2015, told a similarly vague tale, stating that it was raising COI Rates for these specific policies because "management expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established."  These stated reasons by AXA, however, were and are false, as AXA has experienced neither higher mortality rates, nor lower investment income for all AUL II Policies.

26.     As with the amount of the increase, AXA also never explained to policyholders how its mortality and investment income assumptions had altered.  Indeed, AXA has not publicly disclosed, made available for public comments, or publicly filed any of its revised COI Rates or the documents supporting its decision to increase such rates.  AXA has argued against the public disclosure of any analyses that could supposedly support the COI Rate increase.  Further, the percentage increase of COI Rates was never made publicly available for comment prior to its implementation.

27.     AXA's COI Rate increase breaches the terms of the LSH Policies in the following ways.  *First*, the COI Rate increase was not "equitable to all policyholders of a given class." *Second*, the COI Rate increase was not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses."  *Third*, the COI

Rate increase effectively was an evasion of the contractually guaranteed minimum crediting rate of 3%. *Fourth*, in instituting the COI Rate increase, AXA failed to comply with numerous regulations and standards on file with the applicable state insurance regulators. *Fifth*, the COI Rate increase breached the implied covenant of good faith and fair dealing that is inherent in every insurance policy.

C.    AXA's COI Rate Increase is Inequitable

28.    The LSH Policies have an explicit provision that states that "[c]hanges in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis *that is equitable to all policyholders of a given class*." (Emphasis added.) Put another way, AXA is not permitted under the policies to institute a change that unfairly discriminates against policyholders within the same class.

29.    However, AXA's COI Rate increase is far from "equitable to all policyholders of a given class." Instead, it impermissibly discriminates against only a subset of policyholders within a larger class—those with issue ages 70 and above and a current face value amount of $1 million and above.

30.    The only "class" that is referred to in the LSH Policies is the "Rating Class" or "class of risk," neither of which is based upon issue age or face value. A copy of the AUL II Product Guide distributed to AXA's sales force refers to Rating Classes as "Underwriting Classes," but Underwriting Classes represent a range of mortality risks, such as a "Preferred Plus Non-Tobacco User" or a "Standard Non-Tobacco User." *See **Exhibit 5***. While certain issue ages qualify for specific Underwriting Classes, neither issue age nor face value are characteristics of the Rating or Underwriting Class. For example, the Preferred and Preferred Plus Underwriting Classes consist of issue ages 70 and above as well as 69 and below.

31.     More importantly, there is no equitable or actuarial basis for singling out AUL II Policies with issue ages of 70 and above when the insureds' age did not create a sub-class at the time of issuance of such policies.  There also is no equitable or actuarial basis for targeting AUL II Policies with face amounts of $1 million and above.

32.     Prior to the COI Rate increase, AXA's mortality rate assumptions for any given insured were equal for a $999,999 and a $1 million face value policy.  However, the COI Rate increase has been applied in a step fashion and thus affects only the latter and not the former (*i.e.*, those with a $1 million policy and above got a full increase, and those with a $999,999 and below policy got no increase).  Thus, the $1 million policyholder is being treated inequitably as compared to the $999,999 policyholder, and no reasonable assumption as to mortality would differ between policies and justify this artificial treatment.  AXA cannot reasonably expect that the insured on a policy issued at age 70 with $1 million in face value is likely to die materially sooner than the insured on a policy issued at age 70 with $999,999 in face value.

33.     The actuarial basis for any such assumption also is lacking.  Indeed, actuarial studies indicate *lower* mortality rates for larger face policies.  *See, e.g.*, Report to the Society of Actuaries by Mary Bahna-Nolan, May 23, 2012, at 7).  According to the Actuarial Standards Board, an "A/E ratio" equals:  actual deaths in a group of lives being evaluated over a specified period of time divided by the expected deaths over the same period.  Upon information and belief, AXA's A/E ratios of issue age 70 or more and with more than $1 million in face value are consistent with industry ratios and actually demonstrate a *more favorable* mortality experience than face amounts of less than $1 million, but policies with face amounts of less than $1 million were not subject to the COI Rate increase.  Upon information and belief, AXA's own A/E data demonstrates its inequitable treatment of policyholders in a given class.

34.     Even if the COI Rate increase was based on a reasonable assumption as to investment income (which it was not), AXA's overall investment income experience does not justify the increases on only a subset of policyholders based on their issue age and/or the face amount of the policy.  AXA does not make investment decisions on a policy-by-policy basis, as the money for investments is pooled together and performance does not depend on any particular policyholder or subset of policyholders.  Accordingly, the COI Rate increase is not being implemented "on a basis that is equitable to all policyholders" in the relevant class. Furthermore, if there were adverse changes in AXA's investment income expectations, interest rates would have a greater impact on AUL II Policies with lower rather than higher issue ages, because AXA would expect to realize the shortfall in expected investment income over the course of many more years for AUL II Policies with lower issue ages.

35.     The LSH Policies also do not permit AXA to use issue age or face value as a basis to raise COI Rates or to comprise a class of policyholders.  There is a contractual commitment by AXA not to single out a small group of policyholders unfairly and subject them to a rate hike.  If AXA simply could manufacture classes whenever it so desired, it would render the contractual language meaningless.

36.     The COI Rate increase is inequitable also because it treats policies within a specific risk class differently.  For example, the increase will not apply consistently to "Standard" risk-class policyholders if they have different face values or issue ages.  It is not equitable to re-determine COI Rates for certain policies in a specific risk class while completely ignoring the other policies in the same risk class, even though those similarly-situated policies had been priced together and had similar experiences.  Treating members of risk classes

differently retrospectively, that is, after issuance of their policies, and applying a COI Rate increase to only a portion of that group is contrary to the plain language of the policies.

37.    AXA is targeting its increased COI Rates on policyholders based on their funding patterns, which is neither equitable nor permissible.  As press reports indicate, AXA increased the COI Rate on a group of policyholders that were selected in part for their pattern of premium payments—those who exercised their contractually permissible right to minimally fund their policies.  But funding pattern or Policy Account value is not one of the enumerated factors that AXA may consider in adjusting its COI Rates.  It is simply inequitable for AXA to punish policyholders merely for exercising the fundamental contractual right to utilize the policies as they were marketed and designed to do, which is to be flexible enough to permit policyholders to select whatever funding pattern they choose.

38.    *Finally*, AXA has not increased COI Rates across the board for other AUL II Policies.  AXA has represented to the public that it has no plans to raise COI Rates on any other products, including products it is currently selling.  If AXA actually had experienced deviations from its expectations of future mortality or investment income, its COI Rates would have increased for a broad range of life insurance policies, not merely AUL II Policies.  That AXA implemented such a narrow and targeted COI Rate increase confirms that the change was done in an inequitable manner.

D.    AXA's Justifications for Raising COI Rates are Pretextual

39.    The LSH Policies enumerate six "reasonable assumptions" that any COI Rate "changes" must be "based on":  "expenses, mortality, policy and contract claims, taxes, investment income, and lapses."  Therefore, the LSH Policies require that COI Rate adjustments must be based on *reasonable assumptions* as to those six factors, and only those six factors.

Further, the magnitude of the changes to those specific six factors must actually support the magnitude of the COI Rate change.

40.    None of the enumerated factors supports the COI Rate increase on the LSH Policies, and even if changes to those factors occurred, they would not support the scope of the rate hike imposed by AXA.

41.    AXA has attempted to rely on two assumptions in support of the COI Rate increase—mortality and investment income.  However, neither factor credibly warrants the increase, as AXA's assumptions are unreasonable and, in the case of mortality, not tethered to empirical evidence, and have no correlation to the magnitude of the COI Rate increase.

     i.    <u>Mortality</u>

42.    One of the reasons AXA cites to justify the COI Rate increase is its supposed assumption that policyholders are dying sooner than expected.  However, this assumption is far from reasonable and indeed, the exact opposite is true.

43.    As a general matter, mortality rates have improved steadily each year.  That is, mortality rates have gotten *better* over time.  It is common knowledge in the life insurance industry that people are living much longer than anticipated several years ago when AXA priced the AUL II Policies.  For example, in 2015, the National Center for Health Statistics ("<u>NCHS</u>") reported "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed that the year-to-year improvement was consistent with long term trends.  Sherry L. Murphy, et al., *Mortality in the United States, 2014*, NCHS Data Brief No. 229, at 5 (Dec. 2015).  In 2017, the NCHS reported that "the age-adjusted death rate decreased by 0.6% from 733.1 deaths per 100,000 standard population in 2015 to 728.8 in 2016."  Kenneth D. Kochanek, et al., *Mortality in the United States, 2016*, NCHS Data Brief No. 293, at 1 (Dec. 2017).

44.    The National Association of Insurance Commissioners periodically issues (or requests the Society of Actuaries to issue) a series of Commissioners Standard Ordinary ("CSO") mortality tables, which are industry standard and commonly used in the industry by insurers to calculate the cap for universal life cost of insurance charges.

45.    For the mortality assumptions underlying the LSH Policies, AXA relied upon the "1980 Commissioners Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables" (for attained ages 18 and over) ("1980 CSO").

46.    However, since the time of the 1980 CSO that was relied upon by AXA, there have been multiple studies and updates to the mortality tables.  For example, major updates include the 1990-1995 Basic Select and Ultimate Mortality Tables, the 2001 Valuation Basic Mortality Table, the 2008 Valuation Basic Table, and the 2015 Valuation Basic Table.  The 2001, 2008, and 2015 Valuation Basic Tables each show significant mortality improvements from the 1990-1995 Basic Tables and the 1980 CSO.  These new mortality tables demonstrate that since AXA originally priced the AUL II Policies, mortality has *improved*, not worsened, which would support a *decrease*, not an increase, of COI Rates.

47.    The trend of improving mortality is even more pronounced for older aged insureds, as shown in both the 2008 and 2015 Valuation Basic Tables.  For example, the mortality rates at ages 90-100 are lower in the recent tables than in the 1980 CSO.  Moreover, the NCHS recently reported that death rates *decreased significantly* between 2015 and 2016 for age groups 65–74 (0.5%), 75–84 (2.3%), and 85 and over (2.1%).  *See* Kochanek at 3.

48.    There is simply no negative mortality experience to justify an increase to the COI Rate, let alone the severe increases that AXA imposed.  Moreover, through early 2015, AXA told the opposite to regulators, as it regularly informed them through its public filings that it had

not observed a negative change in its mortality experience, revealing AXA's pretextual basis for the rate increase. This further belies any tale by AXA that it has suffered a serious setback in mortality assumptions.

      ii.    <u>Investment Income</u>

    49.    AXA also has attempted to justify its COI Rate increase based on supposed changes to its expectations of future "investment experience," stating that its "investments were earning less than forecast when the policies were sold." This investment experience cannot warrant the rate hike at issue for a number of reasons.

    50.    *First*, upon information and belief, AXA makes investments by aggregating its capital, rather than making investments based on individual policies. Accordingly, any income that AXA earns is based on the performance of the investment of aggregate capital, and not the investments of individual policies or even a subset of policies. Therefore, even if AXA's investment income had changed, there would be no reasoned basis to increase COI Rates solely on a subset of AUL II Policies (*i.e.*, those with higher issue ages and face amounts). In this regard, and as explained above, the increase also is "inequitable" in that a change in investment income cannot justify an increase on this particular group, and because it cannot justify disparate increases within the group hit by the increase.

    51.    *Second*, since 2005 (the earliest issue date for the LSH Policies), there has been no discernible downward trend in AXA's publicly reported "investment income." To the contrary, AXA's public securities filings for 2005 through 2016 show significant fluctuations in the reported investment income, both up and down. Even if there was a discernible trend with respect to investment income assumptions (which there is not), the COI Rate increase must be reasonably tethered to such trend. However, there is no discernable correlation between

investment income and COI Rates, let alone one that would justify a COI Rate increase of at least 40% on average. In any event, consistent with the favorable mortality trend, with the exception of 2013, AXA's actual investment income experience in its life insurance portfolio has consistently been positive and its net interest margin for this insurance product (*i.e.*, AXA's total investment return less the guaranteed minimum crediting rate of 3%) has been well above zero over the last five years, belying the notion that a deterioration of its investment income assumptions was the catalyst for the COI Rate increase.

52.     *Third*, while AXA is permitted to earn investment income from both the mortality component and the savings component, it may consider investment income only from the former when determining the cost of insurance. Any investment income earned from the savings component is relevant only to setting the interest rate that is applied to those accounts; it is not relevant to determining the COI. This is consistent with the notion that the COI charge is intended only to cover the risk of the insured's death and not the investment income risk associated with the policyholder account. Therefore, AXA's investment income expectations could be affected only by a change in mortality profit (because there would be less to invest) or interest rates on those investments. If AXA's investment income expectations were changed because of a decline in interest rates, any such decrease (*e.g.*, from 5% to 1%) would not reasonably result in a COI Rate increase of at least 40% on average. And as explained above, if AXA experienced favorable mortality trends, that should offset the costs associated with the lower than expected investment income, and should have resulted in a COI Rate decrease.

53.     *Fourth*, to the extent AXA raised COI Rates to achieve original profit expectations, doing so would be impermissible not only because it would fail to meet the criteria for a permissible increase pursuant to the "Changes in Policy Cost Factors" provision of the LSH

Policies, but also because the New York State Department of Financial Services has stated that life insurance companies do not have free reign to raise COI Rates "simply to boost profits" because profit margin is not an experience factor. Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), http://www.dfs.ny.gov/about/press/pr1611171.htm. Upon information and belief, AXA based its COI Rate increase on impermissible factors such as how policyholders have chosen to fund their policies and AXA's expected investment income on the savings component. In short, AXA imposed the COI Rate increase solely to boost its profits, and profit is not a permissible factor under the contract that AXA can consider when changing COI Rates. Moreover, using COI Rates to guarantee AXA's original profitability assumptions would constitute prioritizing its own interests over the rights of policyholders, which constitutes a breach of the implied covenant of good faith and fair dealing.

E.    The COI Rate Increase Circumvents the Guaranteed Minimum Crediting Rate

54.    As stated above, the LSH Policies contain a provision that assures a guaranteed minimum crediting rate of 3% on any balance remaining in the Policy Account after monthly charges are deducted. Moreover, the LSH Policies promise that even if other cost of policy factors change, including COI Rates, this will "never result in an interest crediting rate that is lower than" the guaranteed minimum crediting rate.

55.    AXA has pointed to its less than favorable investment expectations as one of the main bases for its COI Rate increase. To the extent AXA considered investment income from the savings component, then the rate increase also violates the provision that any change in COI Rates never will result in an interest crediting rate that is lower than that guaranteed in the policies.

56.     This is apparent because if investment income expectations from the savings component had fallen to a level that was near or below the guaranteed minimum crediting rate, then the simple solution for AXA would have been to lower the crediting rate on the Policy Accounts, which, however, it is not permitted to do to the extent that it would cause the crediting rate to fall below the guaranteed rate.

57.     AXA's ultimate course of action, however, is an impermissible attempt to circumvent the guaranteed minimum crediting rate.  AXA cannot use the COI Rates to achieve a crediting rate that is lower than the guaranteed minimum crediting rate.  This is expressly prohibited by the LSH Policies where they state that any change in policy costs factors "will never result in an interest crediting rate that is lower than that guaranteed" in the policies.

58.     By circumventing the guaranteed minimum crediting rate, AXA expressly breached the terms of the LSH Policies as well as the implied covenant of good faith and fair dealing.

F.     <u>Non-Compliance with Procedures and Standards on File</u>

59.     In addition to their prohibition on COI Rate increases that are inequitable and/or are not based on reasonable assumptions as to any of the enumerated factors and/or result in a crediting rate lower than the guaranteed minimum rate, the LSH Policies provide that any COI Rate increase must be "determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered."

60.     AXA's COI Rate increase also breaches this provision of the contract, as AXA failed to comply with numerous regulations and standards on file with the applicable state insurance regulators.

61.    For example, in New York State, AXA is required to file answers to interrogatories annually and give actuarial opinions as to the determination procedures for its non-guaranteed elements, such as COI Rates and charges.  Upon information and belief, on February 25, 2015—just seven months before the increase was announced—AXA responded "no" to the question of whether it anticipated to experience factors underlying any non-guaranteed elements that would be different from current experience.  If the information provided to the regulators was true, then it is untenable that AXA discovered an adverse change in its income justifying a such an exorbitant increase a mere seven months later.

G.    AXA's Misrepresentations

62.    From the early 2000s to 2015, AXA represented the value of its policies to potential buyers and policyholders through hypothetical account value illustrations based on its pre-2015 mortality assumptions.  LSH and their predecessors-in-interest received such illustrations.

63.    For instance, LSH acquired the LSH Doe Policy attached to this complaint as *Exhibit 2* in July 2011.  Prior to the acquisition of this policy, LSH reviewed and relied upon the illustrations provided by AXA.  Such illustrations purported to accurately show the growth of the Policy Account value and the embedded cost of insurance deductions that the policyholder could expect through the maturity of the policy.  Based on the data provided in those illustrations, including the projected "Annualized Premium Outlay," the "Net Policy Account Value," and the policy charges, LSH calculated the embedded COI Rate curve, and relied on such illustrations in their decision to acquire the LSH Doe Policy.  After acquisition of this policy, LSH continued to rely on illustrations provided by AXA every year thereafter to confirm the embedded COI Rate

curve based on the information and examples provided by AXA in such illustrations, and relied on such illustrations in deciding to continue to fund the LSH Doe Policy.

64.     The COI Rate curve for this policy, calculated by LSH using the charges, rates, and examples in the 2009 through 2015 illustrations (specifically, the October 2009, December 2010, April 2011, January 2012, July 2013, June 2014, and July 2015 illustrations) was consistent year after year and the COI for each policy year was materially consistent.

65.     In February and July 2017, after it had implemented the COI Rate increase, AXA provided new illustrations for the LSH Doe Policy.  The February and July 2017 illustrations show that the previous COI Rate curve is no longer accurate and the COI Rate curve embedded in these recent illustrations results in significantly higher COI deductions.

66.     To illustrate these points, the COI deductions for policy years 12 – 21 in the July 2015 illustration can be compared to the one in the 2017 illustrations.  In the July 2015 illustration, COI deductions total $17,427,482 for year 12 through year 21.  These COI deductions for years 12 through 21 are materially consistent with the embedded COI deductions in all six of the prior year illustrations.  New COI deductions after the COI Rate increase are now shown in the February 2017 and July 2017 illustrations.  In the February 2017 illustration, the COI deductions for year 12 through year 21 now total $22,029,527 – an increase of almost $5 million over this time period.  Similarly, the July 2017 illustration shows COI deductions for year 12 through year 21 totaling $22,309,205, also resulting in an increase of almost $5 million when compared to years 12 – 21 of the July 2015 illustration.

67.     The differences between these illustrations immediately before and after the COI Rate increase shows the dramatic increase in COI deductions.  No major economic event occurred between July 2015 and February 2017 that would justify an increase of this proportion.

If AXA's stated reasons for its COI Rate increase are to be believed, then the projections it provided to LSH in July 2015 and before were consistently overly optimistic year after year, and AXA necessarily must have known at some point during the seven-year period from October 2009 through July 2015 that the assumptions behind those illustrations bore no relation to reality.

68.    Similar illustrations were provided by AXA for each of the other LSH Policies, and if AXA's purported bases for the COI Rate increase are true, then it necessarily follows that all of such illustrations on all LSH Policies were misleading and false when made.  In other words, AXA now claims that its mortality assumptions have worsened since the marketing of these policies, justifying the increase in the COI Rate.  Yet, as alleged above, mortality rates have consistently improved over this period.  If AXA is correct that current morality assumptions justify its 2016 rate hike, then the mortality assumptions underlying the materials given to current and future policyholders, including LSH, prior to the COI Rate increase announcement were deceptively and unreasonably optimistic.  Likewise, it defies credulity that AXA's investment income assumptions changed overnight, especially in the absence of any major macro- or micro-economic event.  The disparity between the assumptions used to induce the public to buy policies and used to induce policyholders to continue paying premiums on their policies and the assumptions now used to justify the increase in the COI Rate for these policies is stark, dispelling any notion that it could be the result of anything but intentional deception.

69.    In addition, if AXA's basis for increasing the COI Rates is true, then it filed knowingly false responses to interrogatories from New York regulators from at least 2007 to 2015.  When asked whether its "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience" and whether it "believe[s] there is a substantial probability that illustrations authorized by the company to be presented on new and existing

business cannot be supported by currently anticipated experience," AXA answered "No" every year from 2007 to 2015.

70.    If AXA's stated bases for the COI Rate increase are to be believed, then it necessarily follows that AXA's representations through illustrations and public filings painted an unrealistically optimistic picture of its assumptions that would determine the policyholders' costs of maintaining such policies until the insureds' death or maturity.  If so, AXA's representations through illustrations and public filings were misleading and designed to induce potential customers to buy policies and existing customers to fund their policies by making those policies appear more valuable than they actually were.

71.    Because of AXA's misleading and false statements about the cost of its policies, LSH were induced to purchase these policies in the secondary market for a higher price than they were worth and to continue to pay premiums towards the policies to keep them from lapsing.

72.    LSH did not and could not have discovered through the exercise of due diligence that they were injured by these false representations until October 2015, when the COI Rate increase was announced.

### FIRST CLAIM FOR RELIEF
#### (Breach of Contract)

73.    Plaintiffs repeat and reallege paragraphs 1 through 72 as if fully set forth herein.

74.    The LSH Policies are valid and enforceable contracts.

75.    Plaintiffs have performed their obligations under the LSH Policies and are not in breach thereof.

76.    AXA's COI Rate increase has breached the policies materially, specifically the provision entitled "Changes in Policy Cost Factors," in several respects, including but not limited to the following:

a.      Increasing the COI Rate on a basis that is not equitable to all policyholders of a given class;

b.      Basing the COI Rate increase on unreasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses;

c.      Basing the COI Rate increase on factors other than those enumerated in the policy;

d.      Increasing the COI Rate in an attempt to circumvent the guaranteed minimum crediting rate; and

e.      Increasing the COI Rate not in accordance with the procedures and standards on file with the insurance supervisory official of the jurisdiction in which the policy was delivered.

77.      As a direct and proximate cause of AXA's material breaches of the LSH Policies, Plaintiffs have and will suffer damages in an amount to be proven at trial, and as high as nearly $200 million through maturity of the LSH Policies.

SECOND CLAIM FOR RELIEF
<u>(Breach of Implied Duty of Good Faith, Contractual)</u>

78.      Plaintiffs repeat and reallege paragraphs 1 through 77 as if fully set forth herein.

79.      The LSH Policies are valid and enforceable contracts.

80.      Plaintiffs have performed their obligations under the LSH Policies and are not in breach thereof.

81.      As valid and enforceable insurance contracts, each of the LSH Policies contains an implied covenant that the parties will exercise good faith and fair dealing with respect to the performance of the contract.

82.      AXA materially breached the implied covenant of good faith and fair dealing contained in the LSH Policies in several respects, including but not limited to:

a.      Charging excessive COI Rates that deprived Plaintiffs of the benefit of their actual Policy Account values;

23

b.  Significantly raising COI Rates intending to target certain policyholders who choose to pay premiums that cover only insurance costs, thus punishing those policyholders for exercising their contractual rights and frustrating an essential benefit of the policies;

c.  Using COI Rates to guarantee AXA's profitability assumptions, thereby placing its interest in maximizing gains over the rights of policyholders;

d.  Targeting Plaintiffs for COI Rate increases without a reasonable actuarial basis for doing so;

e.  Basing COI Rates on considerations of investment income earned on Policy Accounts rather than mortality profits;

f.  Using its discretion over COI Rates to circumvent contractual requirements for the guaranteed minimum crediting rate; and

g.  Attempting to coerce Plaintiffs either to allow the LSH Policies to lapse or to pay exorbitant premiums that AXA knows would substantially reduce the value of the policies.

83.  AXA's acts were consciously and deliberately designed to destroy Plaintiffs' rights to receive the fruits of their contracts and violated covenants which Plaintiffs reasonably believed were included in the contracts.

84.  As a direct and proximate cause of AXA's material breaches of the covenant of good faith and fair dealing contained in the LSH Policies, Plaintiffs have and will suffer damages in an amount to be proven at trial, and as high as nearly $200 million through maturity of the LSH Policies.

## THIRD CLAIM FOR RELIEF
### (Breach of Implied Duty of Good Faith, Tortious)

85.  Plaintiffs repeat and reallege paragraphs 1 through 84 as if fully set forth herein.

86.  LSH Policy Nos. 156223456 and 156231821 were issued in Colorado (the "Colorado Policies").

87.    LSH Policy Nos. 157205164, 157203713, 156233099, 157203306, 157203815, 157203285, 156218449, 157205549, 156225890, 156225892, 157205546, 156223115, 156229999, 156233214, and 157205401 were issued in Wisconsin (the "Wisconsin Policies").

88.    LSH Policy Nos. 157219692, 157203465, 157211194, 157204463, 156225479, 155226573, 157207847, 156202728, 157204339, and 157204338 were issued in California (the "California Policies").

89.    The Colorado Policies, Wisconsin Policies and California Policies are valid and enforceable contracts.

90.    Plaintiffs have performed their obligations under the Colorado Policies, Wisconsin Policies, and California Policies, are not in breach thereof.

91.    As valid and enforceable insurance contracts, each of the Colorado Policies, Wisconsin Policies, and California Policies contains an implied covenant that the parties will exercise good faith and fair dealing with respect to the performance of the contract.

92.    AXA's conduct constitutes bad faith breaches of the Colorado Policies, Wisconsin Policies, and California Policies in several respects, including but not limited to:

a.    Charging excessive COI Rates that deprived Plaintiffs of the benefit of their actual Policy Account values;

b.    Significantly raising COI Rates intending to target certain policyholders who choose to pay premiums that cover only insurance costs, thus punishing those policyholders for exercising their contractual rights and frustrating an essential benefit of the policies;

c.    Using COI Rates to guarantee AXA's profitability assumptions, thereby placing its interest in maximizing gains over the rights of policyholders;

d.    Targeting Plaintiffs for COI Rate increases without a reasonable actuarial basis for doing so;

e.    Basing COI Rates on considerations of investment income earned on Policy Accounts rather than mortality profits;

      f.     Using its discretion over COI Rates to circumvent contractual requirements for the guaranteed minimum crediting rate; and

      g.     Attempting to coerce Plaintiffs either to allow their Colorado Policies, Wisconsin Policies, and California Policies to lapse or to pay exorbitant premiums that AXA knows would substantially reduce the value of the Colorado Policies, Wisconsin Policies, and California Policies.

93.     AXA's acts constitute tortious bad faith breaches of Plaintiffs' insurance contracts with respect to the Colorado Policies, Wisconsin Policies, and California Policies.

94.     As a direct and proximate cause of AXA's bad faith breaches with respect to the Colorado Policies, Wisconsin Policies, and California Policies, Plaintiffs have and will suffer damages in an amount to be proven at trial, and as high as nearly $200 million through maturity of the LSH Policies.

FOURTH CLAIM FOR RELIEF
(Violation of New York Insurance Law § 4226)

95.     Plaintiffs repeat and reallege paragraphs 1 through 94 as if fully set forth herein.

96.     New York Insurance Law § 4226(a)(1) prohibits insurers from "issu[ing] or circulat[ing], or caus[ing] or permit[ting] to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts."  Additionally, § 4226(a)(4) prohibits insurers from "mak[ing] any misleading representation, or any misrepresentation of the financial condition of any such insurer ...."

97.     If AXA's stated justifications for the increase in COI Rates are truthful, then AXA violated New York Insurance Law § 4226(a)(1) and (4) on numerous occasions by:

      a.     Distributing illustrations to potential buyers of its policies and to policyholders which misrepresented the potential value of Policy Accounts by relying on false mortality and investment income assumptions; and

    b.    Submitting answers to interrogatories to New York regulators stating that it did not anticipate to experience any factors underlying any non-guaranteed elements that would be different from current experience.

98.    Because of these misrepresentations, Plaintiffs were induced to purchase the LSH Policies in the secondary market for a higher price than they were worth and to continue to pay premiums towards the policies to keep them from lapsing.

99.    Plaintiffs did not discover and could not have discovered through the exercise of due diligence that they were injured by the COI Rate increase, or by the false representations made by AXA in violation of New York Insurance Law § 4226, much less how that injury was caused, until at the very earliest when the COI Rate increase was announced, and those representations were made known to Plaintiffs.  AXA's conduct as alleged herein constitutes a continuing violation of the law.

100.    As a result of these knowing misrepresentations, in addition to any other penalty the Court may impose, Plaintiffs are entitled pursuant to New York Insurance Law § 4226(d) to all premiums paid or compensation that AXA received as a consequence of its misrepresentations.

FIFTH CLAIM FOR RELIEF
(Declaratory Judgment)

101.    Plaintiffs repeat and reallege paragraphs 1 through 100 as if fully set forth herein.

102.    AXA's actions as detailed above have given rise to an actual case or controversy between the parties and as such, this Court has jurisdiction to award declaratory relief under 28 U.S.C. § 2201.

103.    Plaintiffs seek a declaratory judgment that:

    i.    AXA's COI Rate increase is improper under the LSH Policies and that Plaintiffs' Policy Account values should be recalculated according to the original COI Rates;

  ii. AXA may not define a "class" under the LSH Policies based on issue age and face amount; and

  iii. The COI Rate increases imposed by AXA that are at issue are null and void ab initio.

104. This declaratory judgment will settle future disputes between the parties and will clarify the circumstances under which AXA is entitled to adjust the COI Rates.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1. Awarding Plaintiffs compensatory damages in an amount to be determined at trial, and as high as nearly $200 million;

2. Awarding punitive damages in an amount to be determined at trial;

3. Awarding pre-judgment and post-judgment interest;

4. Awarding the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law;

5. A declaration that (i) AXA's COI Rate increase is improper under the LSH Policies and that Plaintiffs' Policy Account values should be recalculated according to the original COI Rates; (ii) AXA may not define a "class" under the LSH Policies based on issue age and face amount; and (iii) the COI Rate increases imposed by AXA that are at issue are null and void ab initio;

6. Awarding Plaintiffs a penalty in the amount of all premiums paid to AXA; and

7. Any other and further relief as the Court may deem just and proper under the circumstances.

DATED:    New York, New York
          March 8, 2018

HOLWELL SHUSTER & GOLDBERG LLP


By: _____

    Daniel P. Goldberg
    Dorit Ungar Black
    Jayme Jonat
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151
dgoldberg@hsgllp.com
dblack@hsgllp.com
jjonat@hsgllp.com

*Counsel for LSH CO, LSH II CO, and Wells Fargo Bank, National Association, as securities intermediary*