**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY<br>COI LITIGATION<br><br>[This document relates to Related Actions No. 17 Civ.<br>4767 and 17 Civ. 4803.] | No. 17 Civ. 4767 (JMF) [rel. 740]<br>No. 17 Civ. 4803 (JMF) [rel. 740] |

**DECLARATION OF ANDREW BUCKLEY**
**IN SUPPORT OF EQUITABLE'S APPLICATION TO SEAL DOCUMENTS**

ANDREW BUCKLEY, pursuant to 28 U.S.C. § 1746, declares as follows:

1.        I am a Lead Director employed by Equitable Financial Life Insurance Company (f/k/a AXA Equitable Life Insurance Company) ("Equitable").  I respectfully submit this declaration in support of Equitable's application to seal certain documents or portions thereof that the parties in the above-captioned actions temporarily filed under seal in connection with parties' motions *in limine*.  *See generally LSH* Dkt. Nos. 309–333.  The specific documents and portions of documents Equitable requests to seal (the "Proposed Protected Information"), and the specific justifications for each sealing request, are detailed herein, including in Appendix A hereto.

2.        I have worked at Equitable from approximately mid-2004 to the present.  I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries. Among my key responsibilities at Equitable have included pricing new life insurance products and developing mortality assumptions.  I am currently the Head of Life Pricing.  Over the

course of my career at Equitable, I have been involved in valuing in-force business and modeling financial projections.

3.      I have served on Equitable's "Assumption Subject Matter Expert Review Group" since its formation in approximately 2009.  The group has had different names, but it is known informally within Equitable as the "Assumptions Committee."  The Assumptions Committee is composed entirely of Equitable employees.  Its members are actuarial and financial experts from across Equitable's lines of business who convene regularly to review, discuss, and recommend changes to Equitable's proprietary assumptions and the methodologies for generating those assumptions.  These proprietary assumptions include, among other things, mortality rate assumptions, lapse/surrender rate assumptions, and premium funding assumptions.

4.      The Proposed Protected Information generally falls into three categories:  (a) personally sensitive information concerning Equitable customers and other non-parties ("Personal Information"); (b) proprietary and commercially sensitive trade-secret information regarding Equitable's ELAS 12 and/or ELAS 08 mortality assumptions ("ELAS Assumptions"); and (c) other commercially sensitive and proprietary trade secret information relating to Equitable's assumptions and contracts with its reinsurers ("Assumption/Reinsurance Information").

5.      **Personal Information:**  This category includes, among other types of information:  non-party customer, insured, and beneficiary names; and policy numbers.  This information is carefully protected by Equitable and not made available to the public.  In connection with the parties' submissions made in connection with the *Brach* Plaintiffs' motion for class certification [*Brach* Dkt. No. 352], I submitted a declaration supporting the continued

sealing of the personal sensitive information of Equitable's customers and non-parties, which I

understand the Court granted.[1]  I also submitted a declaration supporting the continued sealing

of this information in connection with the parties' motions for summary judgment and

*Daubert*, which was also granted.[2]

7.       Public disclosure of this and similar information in the Proposed Protected

6.       For example, certain pages in the Rebuttal Expert Report of James M. Carson,[3]

reflect the policy numbers of certain AUL II policies and the names of each of the insureds

under those policies.

7.       Public disclosure of this and similar information in the Proposed Protected

Information would invade the privacy of the non-parties if disclosed and could facilitate

financial crimes or harassment against them.  Equitable's customer lists are the result of

enormous investments in, among other things, sales strategy and market research.  Public

disclosure would also provide Equitable's competitors and secondary market purchasers with a

substantial commercial advantage by allowing them to understand which of Equitable's

customers may have particular life insurance or estate planning needs.

8.       **ELAS Assumptions:**  My colleague Harold Luber previously submitted

declarations supporting the continued sealing of information related to Equitable's proprietary

ELAS Assumptions.[4]  Moreover, my declarations submitted in connection with the *Brach*

---

[1] *See* Declaration of Andrew Buckley in Support of AXA Equitable's Application to Seal Documents, dated August 27, 2020 [*Brach* Dkt. No. 409] ("Buckley Decl. of 8/27/20"); Order, dated September 1, 2020 [*Brach* Dkt. No. 417].

[2] *See* Declaration of Andrew Buckley in Support of AXA Equitable's Letter Motion to Seal Proposed Protected Information in the parties' summary judgment and *Daubert* motions, dated April 14, 2022 [*Brach* Dkt. No. 603] ("Buckley Decl. of 7/29/2022"); Memorandum Opinion and Order, dated July 29, 2022 [*Brach* Dkt. No. 633].

[3] *See, e.g.*, Appendix A, Item No. 3.

[4] *See* Declaration of Harold Luber, dated March 31, 2017 [*Brach* Dkt. No. 96-2] ¶ 4; Declaration of Harold Luber, dated May 7, 2018 [*EFG* Dkt. No. 160-1] ¶ 4; Declaration of Harold Luber, dated June 28,

Plaintiffs' motion for class certification, as well as the parties' summary judgment and *Daubert* motions, also supported the continued sealing of the same type of information. *See* Buckley Decl. of 8/27/20 ¶¶ 8-16; Buckley Decl. of 7/29/2022 ¶¶ 8-16. As Mr. Luber and I explained in our respective declarations, these mortality assumptions are at the core of Equitable's business model and are used for purposes beyond the AULII COI Adjustment—they are used to price new products, manage existing products and business, and develop proprietary cost and profit expectations for a range of existing and future products. Equitable's proprietary mortality assumptions are its equivalent to the secret formula for Coca-Cola. Even partial disclosure could allow Equitable's competitors to reverse engineer the ELAS Assumptions or critical components thereof. This would put Equitable at a significant disadvantage by giving Equitable's competitors the information to undercut Equitable's life insurance product pricing. *See, e.g.*, Luber Decl. of 6/28/18 ¶¶ 4–5; Luber Decl. of 10/12/18 ¶ 5; Buckley Decl. of 8/27/20 ¶ 8; Buckley Decl. of 7/29/2022 ¶ 8. Secondary market purchasers also could use the ELAS Assumptions to identify mortality-based arbitrage opportunities. These secondary market purchasers could compare the ELAS Assumptions to their own mortality assumptions and determine which policies, if acquired, might pose secondary market profit opportunities to Equitable's detriment. Equitable would not have this same information advantage. As a result, Equitable is seeking to seal the ELAS Assumptions and specific details related thereto.

9.      ELAS 12 is a highly proprietary mortality assumption that was used for a range of corporate purposes beyond the COI Adjustment. For example, Equitable used ELAS 12 to

---

2018 [*Brach* Dkt. No. 230-5] ("Luber Decl. of 6/28/18") ¶ 4; Declaration of Harold Luber, dated June 29, 2018 [*LSH* Dkt. No. 78-1] ("Luber Decl. of 6/29/18") ¶ 4; Declaration of Harold Luber, dated October 12, 2018 [*Brach* Dkt. No. 279-1] ("Luber Decl. of 10/12/18") ¶¶ 5-6.

(i) price numerous life insurance products from some point in 2014 through 2020 and (ii) value then-existing in force life insurance products.  Equitable currently uses ELAS 16 as its proprietary mortality assumptions in the pricing of new products and for valuation purposes. Equitable developed ELAS 16 using a similar methodology used to develop ELAS 12.  The related documents and information Equitable seeks to seal or redact would reveal the entirety of the ELAS 12 mortality assumptions and highly sensitive details about the methodologies, calculations, formulae, actuarial judgments, experience, and analyses used to create those assumptions.  Public disclosure of this information would be deeply harmful to Equitable and highly useful to Equitable's competitors and potential arbitrageurs.

10.    Specifically, the types of ELAS 12 documents Equitable seeks to seal include: (a) expert reports analyzing, recreating, and manipulating core aspects of ELAS 12[5] and (b) deposition testimony discussing and explaining the step-by-step procedures, methodologies, analyses, tests, decisions , and actuarial judgments Equitable's actuaries used to develop ELAS 12.[6] Such information is commercially sensitive individually and in the aggregate.

11.    It is important to note that Equitable does not seek to seal generalized information about ELAS 12, such as the basic concepts and methodologies that underlie ELAS 12.  For example, Equitable does **not** seek to seal the discrete, isolated facts found in Plaintiffs' and Equitable's experts reports concerning the development of ELAS 12 that the Court referenced in its decision on the parties' summary judgment and *Daubert* motions, such as, for example the fact that Equitable used separate experience studies and data in developing

---

[5] *See, e.g.*, Appendix A, Item Nos. 1-2, 6, 9-10, 13.

[6] *See* Appendix A, Item No. 5.

portions of ELAS 12.  *See* Opinion and Order, dated March 31, 2022 at 25–31 [*Brach* Dkt. No. 596].

12.    Rather, Equitable requests to seal only specific information that is commercially sensitive and would be harmful if disclosed, such as detailed descriptions of its development of ELAS 12 that would allow a competitor to reverse engineer Equitable's assumptions.[7]  Public disclosure of this, and other ELAS 12-related Proposed Protected Information, would provide Equitable's competitors and secondary market purchasers with critical insights into how Equitable develops its mortality assumptions and uses experience data (including its own propriety experience data), thereby putting Equitable at a significant disadvantage in the life insurance marketplace.

13.    I understand that this Court has previously sealed documents containing information concerning ELAS 12.  Memorandum Opinion and Order, dated November 3, 2017 [*Brach* Dkt. No. 135 at 4-5]; *see also* Order, September 1, 2020 [*Brach* Dkt. No. 417]; Memorandum Opinion and Order, dated July 29, 2022 [*Brach* Dkt. No. 633].  The documents and information Equitable now seeks to seal pertain to the same ELAS 12 subject matter and many are similar to the documents and information this Court has sealed in the past due to the competitive harm their disclosure would cause.

14.    Equitable also seeks to seal certain information concerning ELAS 08.  ELAS 08 is the predecessor mortality assumption to ELAS 12.  ELAS 08 and ELAS 12 are related: Equitable develops its proprietary mortality assumptions using an iterative process, building upon its preceding proprietary mortality assumptions.  *See* Declaration of Harold Luber, dated October 19, 2017 [*Brach* Dkt. No. 122-1] ("Luber Decl. of 10/19/17") ¶ 15; Exhibit J to

---

[7] *See, e.g.*, Appendix A, Item No. 5.

Plaintiffs' Joint Letter Motion to Compel, dated July 9, 2017 [filed under seal; *Brach* Dkt. No. 236-1] at 2 (describing Equitable's mortality assumption iterations from 2004 to 2015); Buckley Decl. of 8/27/20 ¶¶ 14-16; Buckley Decl. of 7/29/2022 ¶¶ 14-16.  ELAS 12 was built, in significant part, on the ELAS 08 foundation.

15.    Although no Equitable life insurance products currently being sold were priced using ELAS 08, ELAS 08 was used to determine cost of insurance rates for numerous in-force products, and key aspects of ELAS 08 are very similar to ELAS 12.  Disclosure of the ELAS 08 mortality assumption information Equitable seeks to seal would allow (a) competitors to draw inferences about in-force products and ELAS 12 that they could use to Equitable's disadvantage, and (b) life settlement companies to develop arbitrage strategies disadvantaging Equitable.  *See* Declaration of Harold Luber, dated March 31, 2017 ("Luber Decl. of 3/31/17") [*Brach* Dkt. No. 96-2] ¶¶ 7, 10; Luber Decl. of 10/19/17 ¶¶ 15-16; Luber Decl. of 6/28/18 ¶ 5; Declaration of Harold Luber, dated December 18, 2018 ("Luber Decl. of 12/18/18") [*Brach* Dkt. No. 314, Ex. 1 ¶ 10]; Buckley Decl. of 8/27/20 ¶ 15; Buckley Decl. of 7/29/2022 ¶ 15.

16.    I understand the Court previously sealed similar ELAS 08 information for these reasons.  *See* Memorandum Opinion and Order, dated November 3, 2017 [*Brach* Dkt. No. 135 at 4-5] (sealing ELAS 08 information described in Luber Decl. of 3/31/17); Order, dated October 20, 2017 [*Brach* Dkt. 123] (sealing ELAS 08 information described in Luber Decl. of 10/19/17); Order, dated July 2, 2018 [*Brach* Dkt. No. 233] (sealing ELAS 08 information described in Luber Decl. of 6/28/18); Order, dated July 2, 2018 [*LSH* Dkt. No. 79] (same); Order, dated December 19, 2018 [*Brach* Dkt. No. 315] (sealing ELAS 08 information described in Luber Decl. of 12/18/18 [*Brach* Dkt. No. 314, Ex. 1]); Order, dated September 1,

2020 [*Brach* Dkt. No. 417]; Memorandum Opinion and Order, dated July 29, 2022 [*Brach* Dkt. No. 633].

17.    **Assumption/Reinsurance Information:**  Documents in this category comprise four subcategories:  (a) Equitable's lapse/surrender and premium funding assumptions effective from 2015 to 2018 for AUL II; (b) Equitable's assumptions concerning its reinsurance treaties and reinsurance rates; (c) Equitable's lapse/surrender, mortality, premium funding, and reinsurance assumptions that it uses for product lines other than AUL II; and (d) experience data related to Equitable's assumptions.  In connection with the *Brach* Plaintiffs' motion for class certification, as well as the parties' motions for summary judgment and *Daubert*, I submitted a declaration supporting the continued sealing of these categories of information, with the exception of information concerning assumptions used for other product lines, which I understand the Court granted.  Buckley Decl. of 8/27/20 ¶¶ 14-24; Buckley Decl. of 7/29/2022 ¶¶ 17-24.

18.    Lapse and Premium Funding Assumptions.  Equitable seeks to seal the lapse and premium funding assumptions used in the COI Adjustment analysis or adopted shortly thereafter, or used to price or value other product lines.  These assumptions were used from 2015 until 2018 and are very similar to the assumptions Equitable uses to price new products and value in-force business today.  Equitable's competitors and secondary market purchasers could use this information to derive Equitable's proprietary cost and profit information, as well as how Equitable:  (a) develops and manages its products, (b) expects its customers and the financial markets to behave, and (c) reacts to experience as it develops.  Public disclosure of any of this information would cause substantial competitive harm to Equitable.  I understand this Court previously sealed this type of information, recognizing the substantial

competitive harm the information's public disclosure would cause.  *See* Order, dated September 1, 2020 [*Brach* Dkt. No. 417]; Memorandum Opinion and Order, dated July 29, 2022 [*Brach* Dkt. No. 633].

19.    Reinsurance Treaties and Rates.  Equitable seeks to seal detailed information regarding its use of reinsurance.  Equitable cedes certain life insurance risk through agreements (known as "treaties") with various reinsurance companies.  These reinsurance treaties typically cover large blocks of policies, often for multiple products, and can cover in-force policies and policies that Equitable may issue in the future.  In the case of AUL II, Equitable uses multiple reinsurers to reinsure portions of its exposure.

20.    Equitable generally negotiates the terms of its treaties (*e.g.*, the block of policies covered, portion of death benefit reinsured, premium paid by Equitable) separately with each reinsurer.  The reinsurance rates set forth in the treaties are highly confidential and are based (at least in part) on both Equitable's and the reinsurer's proprietary mortality assumptions.  Equitable and its reinsurers periodically renegotiate their treaties.  Equitable considers the terms of its reinsurance treaties—particularly the premiums it pays to each reinsurer—to be trade secrets.  As a result, each treaty contains explicit confidentiality provisions preventing the parties from disclosing proprietary information.  Equitable keeps the treaties' terms strictly confidential.

21.    If such information were disclosed, Equitable would be seriously prejudiced in future reinsurance premium negotiations.  *See* Luber Decl. of 10/19/17 ¶¶ 7-10, 12-15; Buckley Decl. of 8/27/20 ¶ 22; Buckley Decl. of 7/29/2022 ¶ 22.

22.    For instance, a reinsurer could infer the value of particular terms of the treaty to Equitable or determine that Equitable is able to afford higher premiums on particular blocks of

9

policies.  I understand this Court previously sealed this type of reinsurance information, recognizing the substantial competitive harm the information's public disclosure would cause. Order, dated October 20, 2017 [*Brach* Dkt. No. 123]; Order, dated September 1, 2020 [*Brach* Dkt. No. 417]; Memorandum Opinion and Order, dated July 29, 2022 [*Brach* Dkt. No. 633].

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2023

_____

Andrew Buckley